FILED
IN CLERK'S OFFICE

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS 16   3

U.S. DISTRICT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Crim. No. 16 - 10273 |
| | ) | |
| v. | ) | |
| | ) | Violation: |
| RAFIA FEGHI, | ) | 18 USC §371 |
| | ) | |
| Defendant. | ) | |

## INFORMATION

The United States Attorney charges that:

### COUNT ONE
(Conspiracy to Defraud the United States and to Obstruct Justice)

### THE CONSPIRACY

1.  Beginning at least in or about August 29, 1991, and continuing through at least July 20, 2016, in the District of Massachusetts and elsewhere, the defendant,

**RAFIA FEGHI**

did knowingly conspire, combine, confederate, and agree with other individuals both known and unknown to the United States Attorney (a) to defraud the United States of and concerning its governmental functions and rights, and (b) to corruptly influence, obstruct, and impede, and endeavor to influence, obstruct, and impede, the due administration of justice in violation of Title 18, United States Code, Section 1503.

### INTRODUCTION

2.  At all times relevant to this Information, defendant **RAFIA FEGHI** was a dual citizen of Iran and of the United States, and was married to Joseph A. Yerardi, Jr. ("Yerardi").

3.  Between approximately 1986 and 1993, Yerardi earned cash from illegal racketeering activities including bookmaking and extortion.

4.  Yerardi was indicted in 1993 and convicted in 1995 in the United District Court for the District of Massachusetts for racketeering, operating an illegal gambling business, extortionate transactions, money laundering, and other crimes. Yerardi's sentence on that 1993 indictment, *United States v. Joseph A. Yerardi, Jr.*, Dkt. 93-cr-10278, included 135 months' imprisonment, a $916,000 forfeiture in the form of a personal money judgment, and a $50,000 fine.

5.  In the more than 21 years since that judgment of conviction, the forfeiture and the fine have never been paid.

6.  While serving his prison sentence on the 1993 indictment, Yerardi's illegal businesses continued, with the day-to-day operations being conducted by Arthur Gianelli and other criminal associates who were not in prison. Throughout that period, defendant **FEGHI** received what she knew were criminal proceeds, which she received mainly in cash and sometimes in money orders.

7.  In 2005, shortly after Yerardi completed his prison sentence from the 1993 indictment, Yerardi, defendant **FEGHI**, Arthur Gianelli, and others were indicted in the District of Massachusetts for racketeering and other crimes committed in the years between 1999 and 2005. In connection with the 2005 indictment, both Yerardi and defendant **FEGHI** filed documents with the Court in which they swore that they were financially unable to afford counsel. During 2009, Yerardi, defendant **FEGHI**, Arthur Gianelli, and others were convicted of felonies in that case.

8.  During 2009, shortly after being sentenced in that case, defendant **FEGHI** filed a motion to eliminate the $3,000 fine that had been ordered, falsely claiming that she could not afford to pay the fine.

9. Also during 2009, Yerardi filed a motion asking the Court to eliminate the $50,000 fine from the 1993 indictment, along with the accumulated $72,500 in interest on that fine, based on the claim that Yerardi had no assets. The Court granted that motion.

10. However, during 2010, the Principality of Liechtenstein notified the United States that defendant **FEGHI** controlled a suspicious account at EFG Bank von Ernst in Liechtenstein that contained over $800,000. A judge in Liechtenstein froze that account.

11. During July 2010, on motion of the United States, the United States District Court for the District of Massachusetts (Gorton, J.) found, in Dkt. 93-cr-10278-NMG (D.Mass.), that the United States had established probable cause that the funds in that Liechtenstein account were subject to forfeiture to the United States pursuant to the July 28, 1995 judgment against defendant **FEGHI**'s husband Yerardi from the 1993 indictment. Accordingly, the Court issued an order restraining those funds.

12. Between September 2010 and July 2016, defendant **FEGHI** and her co-conspirators took a series of further steps to defraud the United States of the funds in the Liechtenstein account and to obstruct justice in pending litigation in Dkt. 93-cr-10278-NMG (D.Mass.).

<u>OBJECTS OF THE CONSPIRACY</u>

13. It was a part and object of the conspiracy that defendant **FEGHI** and her co-conspirators would and did defraud the United States of the $916,000 forfeiture and the $50,000 fine that her husband Yerardi was ordered to pay as a result of his conviction on the 1993 indictment.

14. It was a further part and object of the conspiracy that defendant **FEGHI** and her co-conspirators would and did attempt to defraud the United States of the funds in the above-described account at EFG Bank von Ernst in Liechtenstein.

15. It was a further part and object of the conspiracy that defendant **FEGHI** and her co-conspirators would and did engage in obstruction of justice with regard to the pending litigation in the United States District Court for the District of Massachusetts, in an attempt to deprive the United States of those funds by committing a fraud on the Court.

## MANNER AND MEANS OF THE CONSPIRACY

The manner and means by which defendant **FEGHI** and her co-conspirators accomplished and attempted to accomplish the objectives of the conspiracy included, among others, the following:

16. On August 29, 1991, hours after a search warrant was executed at the apartment of defendant **FEGHI** and her husband Yerardi, **FEGHI** had Co-Conspirator A travel to Canada and open a bank account there in his own name, with $200,000 of proceeds from Yerardi's criminal activities that defendant **FEGHI** withdrew from a bank account that she controlled at Brookline Savings Bank. On or about December 30, 1991, after additional proceeds had been added to that account, Co-Conspirator A closed the account and had the balance of $283,495.67 deposited into an account in defendant **FEGHI**'s own name at the Royal Bank of Canada.

17. During August 1993, shortly before Yerardi was indicted, defendant **FEGHI** removed all the funds from the Royal Bank of Canada account that was in her own name and obtained power of attorney from Co-Conspirator B. A new bank account, with an initial deposit of $400,000, was opened by **FEGHI** and/or by Co-Conspirator B at Royal Bank of Canada in the name of Co-Conspirator B but as to which defendant **FEGHI** had power of attorney, and the address on the account was defendant **FEGHI**'s address in Massachusetts, even though Co-Conspirator B was a citizen and full-time resident of Iran.

18. During January 1995, the government learned (through another search warrant) and informed the Court of the existence of the account in the name of Co-Conspirator B at the Royal Bank of Canada, whereupon the Court (Swartwood, M.J.) issued a January 27, 1995 Order directing that Yerardi's assets up to a total of $916,000 -- explicitly including the account in the name of Co-Conspirator B at the Royal Bank of Canada -- be restrained and repatriated in order to protect the assets for forfeiture in the event that Yerardi was convicted on the pending indictment that had been filed on October 14, 1993.   However, during February 1995, Co-Conspirator B closed the account at the Royal Bank of Canada, causing its balance of $409,000 to be deposited into a new account at LGT Bank in Liechtenstein in the name of Co-Conspirator B, but as to which defendant **FEGHI** had power of attorney. The United States did not learn of this or any other pertinent accounts in Liechtenstein until March 2010.

19. In addition, on February 1, 1995, defendant **FEGHI** opened an account in **FEGHI**'s own name at LGT Bank in Liechtenstein, giving power of attorney to Co-Conspirator A.   On this account, **FEGHI** falsely listed as **FEGHI**'s own address the address in Iran of Co-Conspirator B. During 1995, defendant **FEGHI** deposited more than $272,000 into this account.

20. After Yerardi's sentence on July 28, 1995 included the forfeiture of $916,000 and a fine of $50,000, and after the District Court (Keeton, J.), under 18 U.S.C. § 1963(j), ordered "Yerardi, and all other persons within the jurisdiction of this Court who are holding Yerardi assets outside of the United States ... to repatriate those assets forthwith," defendant **FEGHI** closed her account at LGT Bank in Liechtenstein on September 27, 1995 and transferred its balance of $282,000 into an account at LGT Bank in Liechtenstein in the name of Co-Conspirator A, with defendant **FEGHI** having signature authority over that account.

21. On March 1, 1996, the account in the name of Co-Conspirator A was closed, with the balance of $304,600 being deposited into a new account that defendant **FEGHI** and/or Co-Conspirator C opened at LGT Bank in Liechtenstein in the name of Co-Conspirator C, with defendant **FEGHI** having power of attorney.

22. During December 1999, defendant **FEGHI** opened an account at Bank von Ernst in Liechtenstein in defendant **FEGHI**'s own name, but falsely giving as her home address the Iranian address of Co-Conspirator B.  By mid-January 2000, defendant **FEGHI** had transferred into this account $533,000 in securities from the LGT Bank in Liechtenstein account in the name of Co-Conspirator B plus $281,703.68 from the LGT Bank in Liechtenstein account in the name of Co-Conspirator C, thereby closing those accounts in the names of Co-Conspirator B and Co-Conspirator C.

23. During 2002, Bank von Ernst in Liechtenstein notified defendant **FEGHI** that because of a new regulation, the bank would be required to notify the United States government of all accounts held by United States citizens.  Defendant **FEGHI** thereupon traveled to Liechtenstein and submitted account opening documents in the name of Co-Conspirator B, with defendant **FEGHI** having power of attorney over that new account.  Defendant **FEGHI** closed the existing account that was in defendant **FEGHI**'s own name at Bank von Ernst, and transferred the balance of $866,181 into the new account in the name of Co-Conspirator B.

24. Between 2002 and 2010, defendant **FEGHI** withdrew money and conducted transactions on the account, never notifying Bank von Ernst that Co-Conspirator B died in 2004, which would have terminated **FEGHI**'s power of attorney over that account.

25. During March 2005, Co-Conspirator A testified under a statutory use immunity order, in the grand jury that was investigating Yerardi and defendant **FEGHI**.  Co-Conspirator A

6

knowingly and intentionally testified falsely about defendant **FEGHI**'s assets and source of funds.

26. During December 2008 and June 2009, in connection with the 2005 indictment of defendant **FEGHI**, defendant **FEGHI** filed motions and affidavits with this Court in which defendant **FEGHI** falsely claimed that she was indigent and did not disclose any of the accounts mentioned above.

27. During March 2010, the Principality of Liechtenstein notified the United States of the existence of the account at EFG Bank von Ernst that was in the name of Co-Conspirator B and as to which defendant **FEGHI** had power of attorney. The Principality of Liechtenstein concluded that the account was suspicious, and a judge in Liechtenstein froze the account. This was the first time that the United States had learned of that account or that defendant **FEGHI** and her co-conspirators had ever had any accounts in Liechtenstein.

28. On July 28, 2010, the District Court (Gorton, J.) granted the government's motion in Dkt. 93-cr-10278-NMG (D.Mass.) to restrain the funds in that Liechtenstein account in order to preserve them for forfeiture pursuant to the July 28, 1995 orders that the District Court (Keeton, J.) had entered. But, Defendant **FEGHI**, Co-Conspirator D, and Co-Conspirator E then filed documents with the District Court in which they sought the removal of the restraint on the account, based on a series of statements that were materially false, regarding the true owner of that account and the true source of the funds in that account.

29. Also, starting in November 2010, defendant **FEGHI**, Co-Conspirator D, and Co-Conspirator E, with the assistance of Co-Conspirator A, filed documents with the court in Liechtenstein in which they sought the removal of the freeze on the account, based on a series of

statements that were materially false, regarding the true owner of that account and the true source of the funds in that account.

30. During June 2011, August 2011, and April 2012, Co-Conspirator D and Co-Conspirator E filed a motion, personal affidavits, and legal briefs with the District Court in Dkt. 93-cr-10278-NMG (D.Mass.), containing false material statements about that account.

31. During May 2014, at the direction of defendant **FEGHI**, Co-Conspirator D and Co-Conspirator E provided false material testimony in depositions conducted in connection with the pending proceedings before this Court in Dkt. 93-cr-10728-NMG, concerning forfeiture to the government of the account in the name of Co-Conspirator B at Bank von Ernst.

32. Between October 2015 and June 2016, defendant **FEGHI** demanded that the government take sworn testimony from Individual 1, whom defendant **FEGHI** falsely claimed could and would provide testimony exculpating defendant **FEGHI** and her co-conspirators.

## OVERT ACTS

In furtherance of the conspiracy and to effect the objects thereof, defendant **FEGHI** and her co-conspirators committed and caused to be committed the following overt acts, among others, in the District of Massachusetts and elsewhere:

33. On or about August 29, 1991, defendant **FEGHI** withdrew $200,000 from a bank account that she controlled at Brookline Savings Bank and had Co-Conspirator A travel to Canada and deposit that money into a bank account there in Co-Conspirator A's name.

34. On or about December 30, 1991, defendant **FEGHI** deposited the balance of more than $280,000 from the Canadian account in Co-Conspirator A's name into an account in defendant **FEGHI**'s own name in Canada.       .

35. During August 1993, defendant **FEGHI** removed the funds from the account in her own name in Canada and had $400,000 deposited into a bank account in Canada in the name of Co-Conspirator B but as to which defendant **FEGHI** had power of attorney.

36. During February 1995, defendant **FEGHI** caused the Canadian account in the name of Co-Conspirator B to be closed, and caused its balance of $409,000 to be deposited into a new account at LGT Bank in Liechtenstein in the name of Co-Conspirator B but as to which defendant **FEGHI** had power of attorney.  In addition, defendant **FEGHI** deposited $272,000 into a new account in defendant **FEGHI**'s own name at LGT Bank in Liechtenstein.

37. On September 27, 1995, defendant **FEGHI** closed the account in her own name at LGT Bank in Liechtenstein and transferred its balance of $282,000 into an account at LGT Bank in Liechtenstein in the name of Co-Conspirator A, as to which defendant **FEGHI** had signature authority.

38. On March 1, 1996, defendant **FEGHI** caused the Liechtenstein account in the name of Co-Conspirator A to be closed and its balance of more than $300,000 to be deposited into a new account at LGT Bank in Liechtenstein in the name of Co-Conspirator C, with defendant **FEGHI** having power of attorney.

39. Between December 1999 and mid-January 2000, defendant **FEGHI** opened an account in defendant **FEGHI**'s own name at Bank von Ernst in Liechtenstein into which she caused (a) $533,000 worth of securities to be transferred from the Liechtenstein account in the name of Co-Conspirator B and (b) more than $280,000 to be transferred from the Liechtenstein account in the name of Co-Conspirator C.

40. During March 2005, Co-Conspirator A knowingly and intentionally testified falsely in a grand jury in Boston about defendant **FEGHI**'s assets and source of funds.

9

41. During December 2008 and June 2009, defendant **FEGHI** knowingly and intentionally filed false and fraudulent motions and affidavits in District Court in Boston.

42. Starting in November 2010, defendant **FEGHI**, Co-Conspirator D, and Co-Conspirator E, with the assistance of Co-Conspirator A, filed materially false documents with the court in Liechtenstein.

43. During June 2011, August 2011, and April 2012, Co-Conspirator D and Co-Conspirator E filed a motion, personal affidavits, and legal briefs in District Court in Boston containing false material statements.

44. During May 2014, Co-Conspirator D and Co-Conspirator E provided false material testimony in depositions in Boston.

45. Between October 2015 and June 2016, defendant **FEGHI** caused materially false statements to be made to the United States Attorney's Office.

All in violation of Title 18, United States Code, Section 371.

<div style="margin-left: 40%;">

CARMEN M. ORTIZ
United States Attorney

By:    *Michael L. Tabak*

MICHAEL L. TABAK
Assistant U.S. Attorney
John Joseph Moakley U.S. Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3100

</div>